IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICHOLE K.,[1]

        Plaintiff,

        v.

ANDREW M. SAUL, Commissioner of Social
Security,

        Defendant.

Case No. 3:19-cv-00636-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Nichole K. ("Plaintiff") brings this appeal challenging the Commissioner of the Social

Security Administration's ("Commissioner") denial of her applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the

Social Security Act. The Court has jurisdiction to hear Plaintiff's appeal pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3). For the reasons explained below, the Court reverses the

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

Commissioner's decision and remands this case for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either a grant or a denial of Social Security benefits, the district court "'may not substitute [its] judgment for the [Commissioner's].'" *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## BACKGROUND

## I.    PLAINTIFF'S APPLICATIONS

Plaintiff was born in September 1987, making her twenty-five years old on November 15, 2012, the alleged disability onset date. (Tr. 28, 59, 70.) Plaintiff completed two years of college and has past relevant work experience as a customer service representative. (Tr. 27, 56, 183.) In

her applications, Plaintiff alleges disability due to migraines, syncope, fibromyalgia, and anxiety. (Tr. 60, 71.)

The Commissioner denied Plaintiff's applications initially and upon reconsideration, and on September 7, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 15.) Plaintiff and a vocational expert ("VE") appeared and testified at a hearing held on January 22, 2018. (Tr. 37-58.) On May 2, 2018, the ALJ issued a written decision denying Plaintiff's applications. (Tr. 15-29.) On March 21, 2019, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's written decision the final decision of the Commissioner. (Tr. 1-6.) Plaintiff now seeks judicial review of the ALJ's decision. (Compl. at 1-2.)

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the

burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the sequential analysis, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 15-29.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 15, 2012, the alleged disability onset date. (Tr. 17.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairment: "Migraine [h]eadaches." (Tr. 17.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 19.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform a "full range of work at all exertional levels," subject to these limitations: (1) Plaintiff can occasionally climb ramps and stairs, (2) Plaintiff cannot climb ladders, ropes, or scaffolds, and (3) Plaintiff cannot operate a motor vehicle or "work around hazards," such as unprotected heights and heavy machinery. (Tr. 20.) At step four, the ALJ concluded that Plaintiff could perform her past relevant work as a customer service representative "as actually and generally performed," and therefore concluded that Plaintiff was not disabled. (Tr. 27.) At step five, ALJ concluded that even if she could not perform her past work, Plaintiff was not disabled because a significant number of jobs existed in

the national economy that she could perform, including work as a janitor and hand packager. (Tr. 28.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by failing to provide: (1) specific and legitimate reasons for discounting the opinion of Plaintiff's treating physician, Linda Hungerford, M.D. ("Dr. Hungerford"), and (2) germane reasons for discounting the lay witness testimony provided by Plaintiff's ex-husband, Jeffrey K., and boyfriend, Darren Y. (Pl.'s Opening Br. at 9, 14-16.) As explained below, the Court concludes that the Commissioner's decision is based on harmful legal error and not supported by substantial evidence. The Court also concludes that the record creates serious doubt about whether Plaintiff is disabled. Accordingly, the Court reverses the Commissioner's decision and remands for further proceedings.

## I.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citation omitted). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* Indeed, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

### B.    Analysis

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for discounting the opinion of her treating physician, Dr. Hungerford. (Pl.'s Opening Br. at 14.) The Court agrees.

Dr. Hungerford completed a medical source statement on January 17, 2018. (Tr. 1094-96.) Dr. Hungerford explained that she has served as Plaintiff's primary care physician since August 18, 2016, Plaintiff suffers from "[u]nexplained syncope possibly related to migraine headaches, fibromyalgia, [and] generalized anxiety with panic disorder," and Plaintiff's primary symptoms are "fainting several times a week (on the average 3 times a week), headaches most days, generalized body pain, and panic attacks due to anxiety." (Tr. 1094.) Dr. Hungerford also opined that Plaintiff would "miss 16 hours . . . or more per month from even a simple, routine job because of her impairments, symptoms, or medications and their side effects," noting that Plaintiff's syncopal episodes alone would cause her to miss "8+ days [of work] per month." (Tr. 1096.)

The ALJ provided two reasons for discounting Dr. Hungerford's opinion. (*See* Tr. 26, showing that the ALJ determined Dr. Hungerford's opinion about the effects of Plaintiff's

impairments was inconsistent with Plaintiff's "conservative treatment" history and the fact that there was "improvement in [Plaintiff's] condition with appropriate treatment"; *see also* Def.'s Br. at 5, arguing that the record "provides ample support for the ALJ's conclusion that Plaintiff's relatively conservative treatment regimen and improvement while on treatment were inconsistent with the severe limitations that Dr. Hungerford assessed"). The Court concludes that substantial evidence does not support the ALJ's discount of Dr. Hungerford's opinion on these grounds.

### 1.    Effective Treatment

It is well settled that an ALJ may discount a physician's opinion based on the claimant's effective treatment. *See Romo v. Berryhill*, 731 F. App'x 574, 577-78 (9th Cir. 2018) (holding that the ALJ met the specific and legitimate reasons standard and determining that the ALJ appropriately rejected a physician's opinion based on evidence that the claimant's "condition improved" with treatment, because "'[i]mpairments that can be controlled effectively with [treatment] are not disabling'" (quoting *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006))). The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's migraine headaches and syncopal episodes improved with treatment, and the "ALJ's conclusion" that Dr. Hungerford's opinion was "inconsistent" with such "improvement." (Def.'s Br. at 3-6.)

The Court is not persuaded by the Commissioner's argument, because substantial evidence does not support the ALJ's conclusion that Plaintiff's migraines and syncopal episodes had improved with treatment:

- November 15, 2012: Plaintiff alleges the onset of disability based on migraines and syncopal episodes. (Tr. 15, 59-60.)

- November 21, 2012: Plaintiff reported that she "had 15-20 episodes where she was briefly passed out today." (Tr. 313.)

- February 21, 2013: Plaintiff reported that she had "one to five" episodes per day where she "loses consciousness" and "develops a severe frontal headache associated with photophobia and phonophobia." (Tr. 509.)

- March 25, 2013: Plaintiff reported that she "still ha[d] one or two" syncopal episodes "every day." (Tr. 512.)

- May 22, 2013: Plaintiff reported that her syncopal episodes were "improving and getting less frequent," but she was "[s]till getting them every day, [just] less intense." (Tr. 520.)

- January 29, 2014: Plaintiff's provider stated that Plaintiff had "not been in for regular follow-up because of a lack of insurance," Plaintiff was "still getting [migraines] every day," which "last between [a] half an hour and potentially all day long," and Plaintiff "blacks out about once every other week." (Tr. 522.)

- March 10, 2014: Plaintiff reported that she was experiencing syncopal episodes "once every couple weeks," Plaintiff reported that she was "having daily, almost constant headache[s]," which had increased in severity and frequency "[o]ver the last 2 years," and Plaintiff's provider stated that Plaintiff's fibromyalgia medication "could be driving these headaches." (Tr. 468-71.)

- March 28, 2014: Plaintiff reported that "[h]er migraines persist[ed] despite changing to Topamax," and Plaintiff's physician stated that "her migraines are not well controlled." (Tr. 366.)

- May 13, 2014: Plaintiff's provider noted that the "severity" of Plaintiff's headaches had "decreased," but she "still has daily headache intermittently throughout the day." (Tr. 476.)

- April 16, 2015: Plaintiff's provider noted that Plaintiff still had "almost daily" migraines, a medication could "dull" but "not abort" Plaintiff's migraines, and Plaintiff had "tried and failed amitriptyline, Depakote, and gabapentin for migraine prophylaxis." (Tr. 479.)

- June 16, 2015: Plaintiff continued to complain about "almost daily" migraines, Plaintiff's provider noted that Plaintiff "experienced 15 episodes of syncope since [her] last visit" on April 16, 2015, and Plaintiff's provider stated that Plaintiff was "still averaging 15+ days per month of migraine." (Tr. 483-87.)

- August 18, 2015: Plaintiff's neurologist stated that Plaintiff reported "daily to every other day" migraines. (Tr. 489.)

- December 27, 2015: Plaintiff reported that her "[m]igraine frequency and severity ha[d] decreased," but she was "still averaging 15+ days per month of migraine," including "10 days per month of debilitating migraine." (Tr. 494-95.)

- December 28, 2015: Plaintiff reported that she "now gets headaches about 10 days a month instead of 20 days and they tend to last half a day." (Tr. 559.)

- August 18, 2016: Plaintiff established care with Dr. Hungerford and reported that "at least 2 or 3 times a week" she experiences syncopal episodes "where she will lose consciousness." (Tr. 963.) Plaintiff also reported that "[t]his has been ongoing since 2013." (Tr. 963.)

- October 11, 2016: Plaintiff reported that she was "still averaging 2-4 migraines per week." (Tr. 982.)

- November 23, 2016: Plaintiff reported that she suffered from "headaches daily" and Dr. Hungerford stated that Plaintiff's "headaches are clearly not well controlled." (Tr. 998-1001.)

- December 29, 2016: Plaintiff reported that she was "experiencing syncopal events roughly 4x/week," and Plaintiff's new provider was "strongly suspicious" that Plaintiff was suffering from cluster headaches, which is "an important distinction as the treatment paradigm is different than for migraine." (Tr. 1010-16.)

- May 30, 2017: Plaintiff reported that she continued to experience syncopal events "a couple times a week." (Tr. 1038.)

- September 9, 2017: Plaintiff reported that she continued to suffer from migraines "about twice [a] week where she has severe nausea and at times syncope." (Tr. 1064.)

- September 11, 2017: Dr. Hungerford stated that "[t]he difficulty [Plaintiff] still faces is that she has pretty significant migraine headaches," Plaintiff "still experiences sudden loss of consciousness intermittently," Plaintiff's migraine

headaches are "[i]ntractable," and it is "unsafe for [Plaintiff] to cook over a hot surface [or] drive" given her syncopal episodes. (Tr. 1075-77.)

- January 22, 2018: During a hearing before the ALJ, Plaintiff testified that she suffers from "almost daily" migraines, she has more bad days than good days, and she is irritable, unable to focus, nauseous, and sensitive to light and sound on bad days. (Tr. 41.) Plaintiff also testified that she suffers from syncopal episodes "between two and three times a week," and her migraines have gotten worse because she had to stop taking her medication "six months" ago "due to pregnancy." (Tr. 44-45.)

- May 2, 2018: The ALJ issued a written decision denying Plaintiff's applications and discounting Dr. Hungerford's opinion on the ground that it is inconsistent with the improvement in Plaintiff's migraines and syncopal episodes. (Tr. 15-29.)

Based on this timeline, substantial evidence does not support the ALJ's finding that Dr. Hungerford's opinion about the number of days of work that Plaintiff would miss each month was undermined by the improvement in Plaintiff's migraines and syncopal episodes. Indeed, the longitudinal record shows that although Plaintiff reported some improvement, Plaintiff also continued to complain about frequent and debilitating migraines and syncopal episodes, which is consistent with Dr. Hungerford's opinion that Plaintiff would miss at least two days of work each month due to her impairments. Accordingly, the Court concludes that the ALJ erred in discounting Dr. Hungerford's opinion on this ground. *See, e.g.,* *Fanlo v. Berryhill*, No. 17-cv-01617, 2018 WL 1536732, at *10 (S.D. Cal. Mar. 28, 2018) (stating that the "ALJ cherry-picked [the claimant's] progress notes . . . to support her conclusion that [the claimant] was

stable and improving, but the ALJ failed to acknowledge progress notes from the same time period that directly contradicted her conclusion," and explaining that ALJs are "not permitted to 'cherry-pick' only the records that support [their] position").

### 2. Conservative Treatment

The ALJ also discounted Dr. Hungerford's opinion on the ground that it was inconsistent with Plaintiff's conservative treatment history. (*See* Tr. 26, discounting Dr. Hungerford's opinion and stating that the "record appeared to reveal only conservative treatment" of Plaintiff's impairments; Def.'s Br. at 5, arguing that the record supports the ALJ's conclusion that Plaintiff's "relatively conservative treatment regimen" was "inconsistent" with Dr. Hungerford's opinion).

Courts have held that an ALJ's reliance on a claimant's conservative treatment history is misplaced when there is no indication that more aggressive treatment options are appropriate or available. *See Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) ("[T]he record does not reflect that more aggressive treatment options are appropriate or available. A claimant cannot be [faulted] for failing to pursue non-conservative treatment options where none exist."); *Cindy F. v. Berryhill*, 367 F. Supp. 3d 1195, 1210 (D. Or. 2019) ("Because the ALJ did not specify what 'more aggressive treatment options [were] appropriate or available,' it would be illogical to discredit Plaintiff 'for failing to pursue non-conservative treatment options where none exist.'") (citation omitted); *Marshall v. Berryhill*, No. 16-cv-00066, 2017 WL 2060658, at *14 (S.D. Cal. May 12, 2017) (noting that the ALJ discounted the claimant's testimony based on her conservative treatment, which included taking prescribed medications and "receiving Botox injections for her migraines," and rejecting the ALJ's reliance on the claimant's conservative treatment because there was "no indication that a more aggressive treatment [regimen] was available").

Here, there is no indication that more aggressive treatment options were available or appropriate to treat Plaintiff's migraines and syncopal episodes. With respect to Plaintiff's migraines, the record shows that Plaintiff tried and failed several medications, Plaintiff diligently took her medication until she got pregnant in 2017, Plaintiff received Botox injections and oxygen therapy, and Plaintiff's physician referred her to a neurologist. (*See* Tr. 52, 479, 489, 1064.) The record, however, fails to show that more aggressive options were available or appropriate.

With respect to Plaintiff's syncopal episodes, there is no basis for concluding that Plaintiff failed to pursue non-conservative treatment options or that more aggressive treatment options were available and appropriate, because, despite taking numerous images and administering numerous tests, Plaintiff's physicians and specialists were not able to figure out what was causing her syncopal episodes, which are "possibly part of [her] headache phenomenon." (*See* Tr. 892, showing that on January 12, 2017, Plaintiff's physician stated the "[e]tiology" of her syncopal episodes was still "[u]nknown," and these episodes are "possibly part of [her] headache phenomenon"; Tr. 484, "Syncope was worked up in 2013 . . . . Head CT was unremarkable, and EEG was negative. Cardiac workup was negative as well."; Tr. 468, noting that Plaintiff was "cleared by cardiology" and "cleared . . . of epilepsy after an EEG and thorough work up").

For these reasons, the Court concludes that substantial evidence does not support the ALJ's finding that Dr. Hungerford's opinion is inconsistent with Plaintiff's conservative treatment.

### 3.    Conclusion

For these reasons, the Court concludes that the ALJ committed harmful error in discounting Dr. Hungerford's opinion. *Cf. Ann Cox v. Colvin*, No. 15-cv-00190, 2015 WL

8596436, at *14 (N.D. Cal. Dec. 14, 2015) ("[T]he ALJ provided only one specific and legitimate reason for giving little weight to Dr. Mandelbaum's opinion . . . . Given that the ALJ erred in evaluating Dr. Mandelbaum's opinion in all other regards, this reason alone is insufficient.").

## II.    LAY WITNESS TESTIMONY

### A.    Applicable Law

An ALJ must consider lay witness testimony concerning a claimant's ability to work. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). The ALJ cannot disregard such testimony without providing reasons that are germane to each witness. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006). "Inconsistency with medical evidence is one such reason." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "Germane reasons for rejecting a lay witness' testimony [also] include inconsistencies between that testimony and the claimant's presentation to treating physicians or the claimant's activities, and the claimant's failure to participate in prescribed treatment." *Barber v. Astrue*, No. 10-1432, 2012 WL 458076, at *21 (E.D. Cal. Feb. 10, 2012). Furthermore, "when an ALJ provides clear and convincing reasons for rejecting the credibility of a claimant's own subjective complaints, and the lay-witness testimony is similar to the claimant's complaints, it follows that the ALJ gives 'germane reasons for rejecting' the lay testimony." *Williams v. Astrue*, 493 F. App'x 866, 869 (9th Cir. 2012) (citation omitted).

### B.    Analysis

Plaintiff argues that the ALJ failed to provide germane reasons for discounting the lay witness testimony provided by her ex-husband, Jeffrey K., and boyfriend, Darren Y. The Court disagrees.

The Commissioner argues that any error in the ALJ's evaluation of the lay witness testimony was harmless because (1) Plaintiff does not "challenge the ALJ's reasons for discounting [her] symptom allegations," and (2) the ALJ's reasons for rejecting Plaintiff's symptom testimony "apply equally" to Jeffrey K. and Darren Y.'s testimony since they did not "describe any limitations not already described by [Plaintiff]."[2] (Def.'s Br. at 9.)

The record demonstrates that Jeffrey K. and Darren Y.'s testimony about Plaintiff's limitations was similar to Plaintiff's testimony about her own limitations. (*Compare* Tr. 37-55, 205-12, *with* Tr. 231-38, 264-67.) Plaintiff does not dispute the Commissioner's assertion that Jeffrey K. and Darren Y. did not identify any limitations not already described by Plaintiff. (*See* Pl.'s Reply at 3-6.) Nor does Plaintiff dispute the Commissioner's assertion that the ALJ's error was harmless given the similarities between Plaintiff's testimony and the lay witnesses' testimony and Plaintiff's failure to challenge the ALJ's discounting of her symptom testimony. (*See* Pl.'s Reply at 3-6.) Accordingly, the Court concludes that if the ALJ erred by discounting the testimony of Jeffrey K. and Darren Y., any error was harmless because the ALJ's analysis of Plaintiff's symptom testimony stands and the same evidence the ALJ referred to in discrediting Plaintiff's testimony also discredits the lay witness testimony. *See Molina v. Astrue*, 674 F.3d 1104, 1121-22 (9th Cir. 2012) (joining "the Eighth Circuit's well-reasoned determination that an ALJ's failure to [even] comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims") (citation and quotation marks omitted); *cf. Johnson v. Colvin*, No. 14-cv-01589, 2015 WL 4698435, at *7 (C.D. Cal. Aug. 6, 2015) ("Plaintiff did not challenge the ALJ's

---

[2] The Commissioner acknowledges that the ALJ erred in discounting Jeffrey K. and Darren Y.'s testimony based on "their relationships" with Plaintiff. (*See* Tr. 27, discounting Jeffrey K. and Darren Y.'s testimony on this ground; Def.'s Br. at 7 n.5, noting that the ALJ erred in doing so.)

adverse credibility determination and cannot now rely on lay witness testimony of the same complaints rejected by the ALJ to resurrect the credibility of those complaints.").

## III.    REMEDY

### A.    Applicable Law

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). In a number of cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the three-part credit-as-true standard is] met." *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014) (citations omitted).

The credit-as-true standard is met if three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citations omitted). Even when the credit-as-true standard is met, the court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

### B.    Analysis

The Court does not determine whether the credit-as-true standard is met here because, even if it is met, the record creates serious doubt about whether Plaintiff is disabled. *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) ("[W]e need not determine whether the three

preliminary [credit-as-true] requirements are met because, even assuming that they are, we conclude that the record as a whole creates serious doubt as to whether Claimant is, in fact, disabled.").

The record includes several reports that create serious doubt about Plaintiff's disability.[3] (*See, e.g.,* Tr. 574, indicating that Plaintiff has "two kids age 7 and 8" and is "responsible for [the] majority of [the] housework"; Tr. 1123, 1138, showing that Plaintiff was looking forward to a large community event in Portland, was going to the weekend event with friends, and was "going to be working the event"; Tr. 1135, reflecting that Plaintiff attempted to become a foster parent; Tr. 952, stating that Plaintiff's headaches were "tolerable in that she can continue on with her normal daily activities"; Tr. 1171, noting that Plaintiff had "been exercising up to 2 hours per day"; Tr. 998, indicating that Plaintiff "admit[ted]" that she "ha[d] started a regular strenuous workout routine" and was "doing some kind of workout at least 5 days per week"; Tr. 1011, showing that Plaintiff exercised a "minimum" of three times per week and five times per week on "average"; Tr. 880, reflecting that Plaintiff injured her shoulder while snow sledding; Tr. 1030, stating that Plaintiff was "exercising 3 to 4 days per week for 2 hours per day" and "twice per week" when she ran out of Tramadol; Tr. 933, noting that Plaintiff's "[p]hysical activity includes walking and circuit training for 30-60 min[utes]"; Tr. 936, indicating that Plaintiff was "[s]till active" two to three times a week and performing "yard work"; Tr. 576, noting that Plaintiff "[t]ries to walk daily" and "[h]as a gym membership and does mostly cardio [and] some weight[s]"; Tr. 734, showing that Plaintiff was "[u]sing the Total Gym at home [and] also walking"; Tr. 1036, reflecting that Plaintiff's neurologist, who administered Botox

---

[3] The Court also notes that Plaintiff does not dispute that the ALJ appropriately discounted her symptom testimony based on, *inter alia,* her activities (including Plaintiff's ability to care for children) and conflicting medical evidence.

injections to treat Plaintiff's migraines, mailed Plaintiff a letter because she "no-show[ed]" for the fourth time at his clinic and asked Plaintiff to sign a "behavior contract"; Tr. 306, stating that the paramedics "apparently had the impression that [Plaintiff] was faking her level of consciousness" during a syncopal episode; Tr. 484, "Syncope was worked up in 2013 . . . . Head CT was unremarkable, and EEG was negative. Cardiac workup was negative as well."; Tr. 509, noting that a "Holter monitor showed only occasional sinus tachycardia," a "sleep deprived EEG did not show any seizure-like activity," and a "head CT did not show any abnormalities"; Tr. 468, indicating that Plaintiff was "cleared by cardiology" and "cleared . . . of epilepsy after an EEG and thorough work up"; Tr. 482, 528, 918, 1015, reflecting Plaintiff exhibited full strength during exams; Tr. 498, stating that an EMG of Plaintiff's "lower extremities did not show any evidence of a peripheral neuropathy or lumbosacral motor radiculopathy affecting either extremity").

This record creates serious doubt about whether Plaintiff is disabled, and therefore the Court remands for further proceedings instead of an award of benefits.

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS this case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

DATED this 11th day of May, 2020.

_Stacie F. Beckerman_

STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 18 – OPINION AND ORDER